IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

LAWRENCE THOMPSON,

    Plaintiff,

V.                                        CIVIL ACTION NO. 3:05-0452

MARY B. CARLISLE, d/b/a/ CEO Admin.,
and KEITH DAVIS, d/b/a Security Officer,

    Defendants.

## MEMORANDUM ORDER

On March 8, 2005, a Mental Hygiene Commissioner, finding probable cause to believe that plaintiff, Lawrence Thompson, was mentally ill and was likely to cause serious harm to himself or others, ordered his involuntary hospitalization,[1] and on that day Thompson was transported to the Mildred Mitchell-Bateman Hospital, a state supported psychiatric hospital in Huntington, West Virginia. Shortly after plaintiff arrived at the hospital he and another patient, "L. M.,"[2] were involved in an altercation. In a complaint, filed under the provisions of 42 U.S.C. § 1983, plaintiff alleges that a security officer at the hospital, Keith Davis, failed to protect him from an assault by "L.M." Plaintiff also alleges that the hospital's Chief Operating Officer, Mary B. Carlisle, failed to

---

[1] In the petition filed with the Commissioner Thompson was said to have had a long history of hospitalizations for mental illness and was described as being "suicidal" and "homicidal."

[2] Defendants refer to this patient as "L.M." in their motion "due to confidentiality requirements," and the Court will refer to him in similar fashion.

attend to his medical needs following the assault. The matter is presently pending before the Court on defendant's motion for summary judgment, multiple responses filed by plaintiff and a reply filed by defendants.

In his complaint, which is the only verified document filed by plaintiff,[3] Lawrence Thompson states that he was injured when the defendant, Davis, left a mentally ill man unattended after the man had made "death threats while wearing a hair net to subdue him from spitting on others." Plaintiff states that the man exited a room and threw plaintiff "into a wall." In sworn statements, taken in question and answer form by counsel for defendants, Davis and Jackie Vannatter, another security officer at the hospital, described the event in somewhat more detail. According to Davis and Vannatter, plaintiff and two others arrived from Kanawha County shortly after they had taken "L.M." into what was called a "search room,"[4] a room off of the "sitting room" through which patients enter the hospital. Plaintiff, along with the two other patients, was seated in the sitting room. Neither "L.M." nor plaintiff and the two patients seated with him were handcuffed, though they had been when brought to the hospital by law enforcement officials. "L.M." was known to be "disorderly" and when he was brought in he was "screaming and hollering" according to Keith Davis. They managed, however, to get him "calmed down" before the incident with plaintiff. "J.M." was known to the officers, they had had prior experience with him and in the past he had "not been violent." After "L.M." became "calm"[5] and after completing their search of him, the security officers

---

[3]When "based on personal knowledge" a verified complaint is treated as an opposing affidavit for summary judgment purposes. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[4]Valuables and items not allowed in the hospital are taken from a patient in the search room and an inventory prepared by the officers.

[5]"L.M." was variously described as being "disoriented," "just blobbing" and "not steady."

left the search room; however, Davis saw "L.M." "stand up and he charged through the front door," apparently going by Davis. It was then that the altercation between "L.M." and plaintiff occurred. While the evidence is conflicting concerning whether "L.M." assaulted plaintiff or plaintiff assaulted "L.M.," the obligation of safety for patients would obviously be raised under either scenario, and for present purposes, it is assumed that, as plaintiff has alleged in his complaint, "L.M." threw him "into a wall." The incident occurred in the "sitting room," Keith Davis along with at least two health service workers and Jackie Vannatter were in that room when it occurred, and within a very short time Vannatter and Davis separated the two men. It is undisputed that following the incident plaintiff complained of pain in his left shoulder, neck and mid-back area.

Asserting that plaintiff's status as an involuntary patient at the state hospital is "analogous to that of a prisoner," and referencing cases establishing Eighth Amendment standards, defendants argue that plaintiff's claim of failure to prevent harm requires a showing of an objectively "'sufficiently serious'" deprivation and a "'sufficiently culpable state of mind'" on the part of state officials. While, as will be noted hereafter, it is clear that the Eighth Amendment has no application to the facts of this case, it is equally apparent that plaintiff's allegations do not establish a deprivation of any constitutional right. As the court pointed out in Youngberg v. Romeo, 457 U.S. 307, 315 (1982), patients who, as plaintiff, have been involuntarily committed to state mental health institutions do not give up "all substantive liberty interests under the Fourteenth Amendment" but retain the substantive due process "right to personal security," which includes "safe conditions." Thus, plaintiff's claim of failure to protect falls under the Fourteenth Amendment, not under the Eighth Amendment. Analysis under the Due Process Clause of the Fourteenth Amendment, however, must take account of the well-established principle that the Constitution "'does not

3

purport to supplant traditional tort law'" and "does not guarantee due care on the part of state officials." County of Sacramento v. Lewis, 523 U.S. 833, 848-49 (1998). As a consequence, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. at 849.

Plaintiff's complaint, even when liberally construed, and undisputed evidence submitted with defendant's motion for summary judgment establish what at most could be characterized as negligence on the part of the defendant Davis. Prior experience with "L.M." had not indicated any inclination for violence on his part. Moreover, while he was not handcuffed or otherwise restrained at the time of the incident, he was clearly not left alone. Immediately prior to the altercation between plaintiff and "L.M." the security officers, though not in the search room with "L.M.," were in the waiting room, and at least two other health service workers were present, one of whom was standing by the door of the search room through which "L.M." emerged. "L.M." "charged" past the defendant Davis who then entered the fray and with Vannatter's help separated "L.M." and plaintiff. Recognizing that it is "behavior at the other end of the culpability spectrum" from negligence "that would most probably support a substantive due process claim," id., it is apparent under the facts of this case that a substantive due process claim is not established by reason of the conduct of the defendant Davis.

There remains plaintiff's claim of denial of medical care which consists of allegations that, after the incident with "L.M.," plaintiff was "not transported to a local hospital" though, following his release from the state hospital approximately two weeks later, he learned, after being seen at Cabell Huntington Hospital, that he had "sustained a possible rotator cuff injury." With respect to this claim, defendants, relying on the deliberate indifference standard applicable to claims of denial

4

of medical care to pretrial detainees and convicted prisoners, assert that the evidence does not show deliberate indifference to plaintiff's medical needs. In Youngberg v. Romeo, supra at 321, the court, evaluating claims of safety, freedom from bodily restraints and "habilitation" asserted by an involuntarily committed retarded patient, held that a "professional judgment" standard was the standard to be applied in cases involving claimants who had been involuntarily committed to state mental institutions. Under this standard, "'the Constitution only requires that the courts make certain that professional judgment in fact was exercised.'" Id. The court noted that it was "'not appropriate for the courts to specify which of several professional acceptable choices should have been made.'" Id. Moreover, with respect to a decision made by a "professional," liability could only be imposed "when the decision by the professional [was] such a substantial departure from acceptable professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323. While a claim of inadequate medical care was not before the court in Youngberg, in this Circuit the Youngberg standard has been extended to denial of medical care claims asserted by involuntarily committed mental patients, Patten v. Nichols, 274 F.3d 829, 836 (4th Cir. 2001), and it is that standard which governs plaintiff's claims with respect to inadequate medical care in this case.

Apart from the fact that decisions with respect to plaintiff's medical care were made by medical providers, not defendants,[6] it is apparent from an examination of the record before the Court on defendants' motion for summary judgment, that a basis for liability under the professional judgment standard is not established by the evidence. Uncontradicted evidence establishes that

---

[6] The doctrine of respondeat superior has no "application under § 1983." Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).

5

plaintiff was seen immediately following the incident by the hospital's admitting psychiatrist, who concluded that his shoulder was not broken. He was seen the next day by a staff physician, Dr. Thacker, whose report evidences a thorough physical examination with attention given to plaintiff's complaints of shoulder, neck and back pain. Dr. Thacker ordered x-rays of plaintiff's left shoulder, cervical spine and thoracic spine and directed that Motrin be provided and moist heat applied, with "range of motion ... started when x-ray results are in."[7] A discharge summary, dictated at the time plaintiff was released, indicates continued attention to his complaints of pain as well as treatment for other physical problems and for his psychiatric problems. By that time, his left shoulder pain had "become better" and the "tenderness in this area gradually subsided."

In order to establish liability under Youngberg's standard, a plaintiff must show a "substantial departure from accepted professional judgment," Youngberg v. Romeo, supra at 323 (emphasis added), and "evidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation ... ." Patten v. Nichols, supra at 845. The evidence in this case clearly does not show a "substantial departure," nor does it provide any basis upon which "'reasonable jurors could find by a preponderance of the evidence' for the non-movant." Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 818 (4th Cir. 1995). Similarly, when evaluated under due process standards, there is no evidence which would support a juror's determination that defendants failed to properly attend to plaintiff's safety.

Based on the foregoing, the Court will grant the motion of defendants for summary judgment and dismiss this action, and it is so **ORDERED**.

---

[7]The x-ray report indicated "no obvious fracture or destructive disease" seen in the left shoulder, "significant disc space narrowing" in the cervical spine, and "slight degenerative disease" in the thoracic spine.

The Clerk is directed to transmit a copy of this Memorandum Order to plaintiff and all counsel of record.

        ENTER:       September 28, 2009

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE